Argued October 13, affirmed as modified November 16, petition for rehearing denied December 20, 1960

## CUTTING ET UX *v.* WITCHER ET AL

356 P. 2d 1053

*Avery W. Thompson*, Roseburg, argued the cause and filed a brief for appellants.

*Don H. Sanders*, Roseburg, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Warner, Sloan, O'Connell and Howell, Justices.

WARNER, J.

This is a suit to remove a cloud upon the title of certain real and personal property situated in Douglas county, Oregon. It is the same property described in an assignment of vendees' interest in the purchase contract to which we will later make reference. From a decree in favor of defendants, plaintiffs appeal.

On or about June 29, 1951, the plaintiffs, Cutting, husband and wife, acquired by purchase from defendant Don E. Witcher a White truck and a Gunderson trailer. For these vehicles they agreed to pay $9,000, payable in monthly installments of not less than $200 per month, with interest at six per cent on all deferred payments. We will hereinafter call this the Oregon

contract. Unless specifically indicated to the contrary, our references to Cutting will be only to the plaintiff C. E. Cutting or Chester Cutting; and our references to Witcher will be only to the defendant Don E. Witcher.

To secure the payment of the purchase price obligation the Cuttings executed and delivered a chattel mortgage to Don Witcher which was a lien upon the truck and trailer. As further security, they delivered to him at the same time an assignment of their vendees' interest or equity in a contract for the purchase and sale of several lots in the city of Roseburg, Douglas county, and items of personal property in the nature of household furniture and appliances in the house on said premises. We will from time to time refer to this instrument as the assignment. Both instruments were subsequently recorded in the office of the County Clerk of Douglas county.

It is the contention of plaintiffs that the debt secured by those instruments has been overpaid and by reason thereof the title to the property covered by the assignment should be relieved of the cloud created thereby. They also ask for an accounting of the alleged overpayment.

The defendants, to the contrary, asserted that a balance of approximately $4,400 remains due on the indebtedness and being the aggregate of the balances due on the Oregon contract and on a California contract to which we will later make reference. Defendants pray for a judgment in that amount and for a decree foreclosing the chattel mortgage and assignment which they claim stand as security for plaintiffs' obligation under the Oregon and California contracts.

The trial court found that $3,893.68 remained due

from the Cuttings to Witcher and granted the foreclosure as prayed.

At the time of the purchase of the White truck and Gunderson trailer from Witcher, it was contemplated that the truck and trailer would be employed by Cutting in hauling logs for Witcher in his then Oregon operations and the compensation he derived from that enterprise would supply, in the main, the funds which Cutting needed for the payment of the $9,000 debt.

In October, 1951, the defendant Witcher moved to Healdsburg, California. Cutting, in June, 1952, followed Witcher and renewed his employment with him.

During the summer of 1952 it became apparent that the White truck would not meet the needs of Witcher's California operation. By mutual agreement and because Cutting did not have the necessary credit, Don Witcher purchased a new Mack truck for $19,500 from Mack Motor Sales, San Francisco, California, under conditional sales contract. Cutting relinquished his title in the White truck to Witcher, who, in turn, used it as a down payment of $5,000 upon the Mack truck. In addition, Witcher paid on the Mack deal various amounts as sales tax, finance, license and insurance charges, totaling $3,572.17. This amount was added to the purchase price.

The trial court found that the parties orally agreed that Cutting would pay Witcher $1,000 per month for eight months of the year and $250 per month during four winter months and when he had paid the full purchase price, the Mack truck "would be his." As in the Oregon contract, payments would be made possible through Cutting's operation of the Mack truck. Meantime, Witcher would continue as vendee under the conditional sales contract. This deal between Cutting and

Witcher is hereinafter referred to as the California contract. There is no evidence that the wife of C. E. Cutting was a party to the California agreement.

The defendants argue that the parties also agreed that the chattel mortgage and assignment executed as security for the $9,000 due under the Oregon contract was to continue as security for the new and larger sum owed by the Cuttings for the purchase price of the new Mack truck and that the Mack truck "be substituted for" and in place of the White truck acquired in the Oregon contract.

This construction of the California contract was categorically denied by the Cuttings. It is the position of plaintiffs that the parties agreed that Cutting was to eventually receive a contract of conditional sale on the Mack truck from Don Witcher, as vendor, and wherein Cutting would be the vendee, at such time as Cutting completed the payment of the $9,000 due under the Oregon contract. Although not precisely so stated by either Cutting or Witcher, it is a fair inference that the total amount to be paid by Cutting to Witcher under the California contract was to equal the total amount incurred by the latter to complete his ownership in the Mack truck.

The trial court in holding for the defendant Witcher decided as a matter of fact that the parties had orally agreed that the security for the Oregon contract was to become the security for the California contract.

Plaintiffs treat the California contract as one of conditional sale and unenforceable under the law of that state because of noncompliance with Civil Code of California, § 2982. They argue that all payments made to Witcher under the California contract should be applied as a further credit to the Oregon contract.

This, if done, would result in an over-payment, entitling plaintiffs to a decree as prayed for in their complaint.

For reasons which will presently appear, we do not find the oral California agreement amenable to the provisions of § 2982, supra, of the California Code.

Assuming the existence of a valid and enforceable contract between the parties in respect to the Mack truck, the most important question in the matter at bar is whether Witcher under the California agreement was protected by the Oregon security.

There is no controversy between Cutting and Witcher that: (1) Witcher agreed to buy, as vendee, the Mack truck on a conditional sales contract at certain monthly payments from the Mack Company; (2) Witcher was to assign his interest in this sales contract to Cutting when and if Cutting completed payments in a certain amount; and (3) Cutting was also bound to complete his payments under the Oregon contract. Cutting further contends that upon completion of the Oregon payments, Witcher would then assign his vendee's interest in the conditional sales contract to Cutting. We accept this construction of the California agreement.

Cutting does not agree that the Oregon security assignment was extended to protect this California contract.

The transcript of testimony is relatively short. From Cutting and Witcher we derive our sole information concerning the California agreement. Both are vague in their memories about certain details relating to the formulation of their final agreement and Witcher, particularly, about the relationship, if any, of the Oregon contract to the California contract. As

we read the record, the California contract was not the product of one meeting. They first determined that the White truck was insufficient for Witcher's California job and a new and more powerful machine would have to be obtained. Cutting, in late July, 1952, delivered the White truck and trailer to Witcher at a place where prospective buyers might view it.

We do not understand that at that time Witcher had in mind purchasing the particular Mack truck in question. Apparently, Witcher did not choose the Mack truck until sometime late in August or early September. Until that choice was made Witcher would not know how much credit he would receive from the White truck as down payment on the new truck, nor would he know the schedule of required monthly payments to complete the Mack deal. It is, therefore, not surprising to find that the memories of the parties at trial time were not at their best as to the details agreed upon between them as they moved during that period from July to September, step by step, toward what resulted in Witcher's purchase of the Mack truck, with the White truck as a trade-in credit.

■ We are, however, satisfied and hold that there was no agreement between the parties that the California transaction was to be in any way protected by security given in conjunction with the Oregon deal. In our opinion, they were two separate agreements, each looking to separate security arrangements. Only momentarily and remotely had they anything in common; that was the transfer of the White truck back to Witcher at the latter's suggestion and its later use by Witcher as a credit upon the price of the Mack truck purchased by him and not Cutting. But that gives no support to Witcher's claim against the Oregon security for moneys due under the California contract.

Aside from the vague, fragmentary and nonpersuasive character of Mr. Witcher's testimony, other facts incline us against acceptance of his version of the California Mack truck deal. We note that at no time did Cutting acquire a title interest in the Mack truck or in a conditional sales contract to the truck which he would legally hypothecate as security under the Oregon chattel mortgage by way of substitution or otherwise. One cannot mortgage what he does not own, nor can one assign a vendee's interest in a conditional sales agreement when none exists.

Mrs. Cutting owned an undivided half interest in the Oregon property conveyed by the assignment. When she joined in that assignment it was given as security for payment of the $9,000 due on the White truck and trailer. Obviously, her interest was not available as further security for the greater amounts due to complete title to the Mack truck without a joinder by Mrs. Cutting. She was not a party to the California deal; she took no part in the negotiations, nor did she later acquiesce in or ratify any phase of it. She did not obligate herself to pay any part of the debt her husband contracted to pay in the Mack deal. How then could defendants expect to bind her to a commitment extending her interest in the assignment as security for a new and additional obligation of over $19,500. No prudent business man would ordinarily rest upon the security of an undivided half interest in an equity of that character, under the circumstances, and we do not believe Witcher ever did.

But there is another reason for repudiating the argument of Witcher that he was to have the benefit of the assignment as security for the California deal. What need had Witcher for additional security if he was to delay assigning his vendee's interest in the Mack

conditional sales contract to Cutting until Cutting had completed his payments under the first sale in Oregon? And if that point was ever reached would not the Mack truck itself have been sufficient security to Mr. Witcher if and when he later assigned his interest in the conditional sale contract to Cutting? We think these questions find their answer in Mr. Witcher's testimony.

On direct examination Witcher gave answer to the following question:

"Q  Was it part of your agreement that the new truck [Mack truck] was to be substituted for the old truck [White truck] as part of the security?

"A  Well, actually, the new truck was security itself.  What I needed the security on was the unpaid balance that he owed me on the other, on the old contract;  * * *."

His security "on the old contract" remained unimpaired as to the assignment of the Cutting equity. The security of the chattel mortgage had, of course, evaporated by reason of the previous transfer of the White truck and trailer to Witcher, with substantial credits accruing to Cutting. But, as we shall later see, Cutting's indebtedness under the Oregon contract had also been substantially reduced by cash payments which had been made by Cutting prior to entering the California deal.

As suggested by Witcher, he had no need for further security because "the new truck was security itself."

Such condition of the record persuades us that Witcher's contention that he is entitled to the security protection of the Oregon assignment comes as an afterthought.

■ We revert to plaintiffs' earlier representation that the court erred in not holding that the California contract was unenforceable because it was oral and it did not comply with the California statute (§ 2982, supra, California Civil Code). The argument is premised upon plaintiffs' erroneous conclusion that the California agreement was, in fact, a conditional sales contract. The contention has no merit. The parties did not enter into an engagement of that character, nor did they contemplate doing so until the happening of a future event; that is, the full payment of the balance due on the Oregon contract.

We conclude that the Oregon contract and California contract were separate transactions, each complete within itself. We also conclude that the Oregon assignment was not extended to become security for the obligations of Cutting under the California agreement. Such conclusions necessitate a revision of the amounts due under each separate agreement.

The parties are in agreement as to the various cash payments made by Cutting to Witcher. Cutting does not challenge the payments made by Witcher in connection with the Mack truck deal, such as sales tax, license fee, financing charges, repairs, etc. Cutting makes no serious objection to the amounts with which Witcher credits him as a result of his sale of the Mack truck and Gunderson trailer to one Charles Crandall for $19,000, nor do we think he successfully can.

The trial court used these amounts in its judgment for $3,893.68. Except that it treats the Oregon and California obligations as one, we find only a few discrepancies in the accounting detail. Following the trial court's calculations, as spread in the court's opinion, and again repeated in the body of Witcher's brief (see

pp 8 and 27), it is evident that the "total balance due Witcher" there appearing as $3,893.68 is in error in addition and should read $3,793.17. We also note that the trial court used $942 as the total of all payments made by Cutting during the year 1951, whereas, the record is clear that this total was $910.72. It is also equally clear and undisputed that Cutting made two payments in the month of June and one in July, 1951. These total $272.13. Except to make the corrections and additions in this paragraph noted, we find the figures employed by the court to be correct.

The trial court treated the debits and credits arising under the two contracts as one, but we are of the opinion that the credits and debits appropriate to the Oregon contract and those appropriate to the California contract must be separately figured. This is essential because, as we have found, only the unpaid balance under the Oregon contract enjoys the security protection of the assignment.

Another figure requires explanation: Witcher sold to Crandall the Mack truck and trailer for $19,000, without assigning a separate sales price to each. Neither Witcher's records nor the court's figures allowing Cutting credit for this $19,000 assign a separate figure for the trailer. This becomes necessary, inasmuch as the Gunderson trailer was an item purchased by Cutting under the Oregon contract and with the White truck was mortgaged to Witcher. Its value must, therefore, stand as a credit to the Oregon contract. The evidence relative to the trailer's value at the time of the Crandall sale appears to support $3,000 as a reasonable and proper amount and we adopt it in our own computations.

In light of the foregoing observations, we recompute the status of Cutting's indebtedness to Witcher under the Oregon contract as follows:

Balance due in 1951 on the original indebtedness ($9,000) as found by the trial court,      $ 8,538.00

Cash payments made by Cutting to this account prior to the Mack truck deal as found by this court:

| | | |
|---|---|---|
| During the year 1951, | $ 910.72 | |
| During the year 1952 | | |
| June 14 | $ 29.36 | |
| June 24 | 167.63 | |
| July 19 | 75.14 | |
| | 272.13 | |

Total cash payments to Oregon contract,    $ 1,182.85

From which we deduct the trial court's figure for cash payments in reaching the above figure of $8,538,    942.00

Net additional cash credit,      $ 240.85

Further credits derived from sales of chattels described in Oregon chattel mortgage, as made by Witcher, but erroneously credited by the trial court to the California deal relating to the Mack truck:

| | |
|---|---|
| From White truck | 5,000.00 |
| From Gunderson trailer | 3,000.00 |

Total additional credits,      $ 8,240.85

Balance due on Oregon contract,      $ 297.15

The foregoing adjustments relating to the Oregon contract, compel the following changes to determine the balance due on the California contract:

| | |
|---|---:|
| Balance due on Mack truck according to figures employed by trial court | $14,500.00 |
| Aggregate of sales tax, financing charges, licenses and insurance, added by trial court, | 3,572.17 |
| | 18,072.17 |
| Less cash from Cutting by Witcher, correctly computed by trial court, | 4,134.67 |
| | 13,937.50 |
| Repair bill on Mack truck paid by Witcher, as deducted by trial court, | 317.67 |
| | 14,255.17 |
| To which we add back the $5,000 originally credited to Mack truck account and by this court credited to the White truck deal (see above), | 5,000.00 |
| | 19,255.17 |
| To which we credit $16,000 of the $19,000 from the sale of Mack truck and trailer to Crandall (the other $3,000 is credited above to the Oregon contract), | 16,000.00 |
| Balance due Witcher on California contract, | $ 3,255.17 |

Remanded for an amended decree in harmony with this opinion. Costs to neither party.